# Sanderson *versus* City of Scranton.

1. Where the surface of lands and the minerals in place thereunder have been severed by the agreement or conveyance of the owner, and the respective divisions have become vested in different owners, the municipal authorities are bound to levy their taxes according to the ownership and value of these divisions. And each owner can be made responsible only for the tax on his interest, whether underlying strata or surface.

2. A. made an agreement with B., leasing to him all the coal beneath the surface of a certain tract of land, of which A. was the owner. The lessee was to mine and remove in each year at least a certain number of tons, which he was to pay for monthly, at a certain rate per ton, whether mined or not, unless mining should be prevented by certain specified contingencies. In case of neglect for thirty days to pay the said royalty, it might be distrained for. And for continued default the lease might be forfeited. The letting, however, was not for a term certain with reversion to the grantor, but without reversion and to be perpetual, until all the coal under the surface had been mined. And the rights and privileges therein conferred were extended to the heirs, executors, administrators and assigns of the respective parties :

    *Held*, that this agreement was not merely a license or lease to mine coal to become the lessee's when mined, but that it operated as such a severance of the surface and subjacent strata, and a sale or assignment of the coal in place, as would relieve the owner of the surface from responsibility for taxes levied upon the coal.

3. The liability of the owner of coal or mineral in place for taxes levied thereon, results from the nature of his estate or interest, and, therefore, he is not relieved from this responsibility, on the principle *inclusio unius est exclusio alterius*, by an express covenant in the instrument of severance that he shall pay all taxes levied upon the coal mined, without recourse to the lessor to refund the same.

February 26, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and CLARK, JJ. GREEN, J., absent.

    ERROR to the Court of Common Pleas of *Lackawanna county :* Of January Term 1884, No. 198.

    Amicable action in debt, and case stated, between the City of Scranton, plaintiff, and George Sanderson, James M. Robb, Samuel Robb, William O. Robb, Thomas Robb, trustee for Ann Eliza Cope, Thomas Robb, and Charles Du Pont Breck, trustee for G. S. Kingsbury, defendants, to recover for taxes assessed by the municipal authorities against certain coal in place which George Sanderson and the devisees of Charles Robb had conveyed by an agreement, alleged by the city to be merely a license or lease, to one John Jermyn.

    By the case stated it appeared that George Sanderson and the devisees of Charles Robb, being on the 10th day of May, 1875, the owners of a certain tract of land underlaid with coal, and containing about one hundred and seventy acres,

situate in the thirteenth ward of the city of Scranton, entered into an agreement with John Jermyn, to lease to him all the coal beneath the surface of said tract of land, excepting and reserving, however, certain specified portions necessary for the support of buildings, etc., erected on the surface. By subsequent assignments the interest of said John Jermyn was assigned to the Delaware, Lackawanna, and Western R. R., and the president and managers and company of the Delaware and Hudson Canal Company. The said tract of land, including and subject to said agreement was conveyed, assigned and transferred to defendants.

The city of Scranton caused the coal conveyed by said agreement, and the surface under which it lies, to be assessed separately as the property of the defendants as follows :

| | |
|---|---|
| Third class land, surface, . . . . | $33,903 |
| Third class land, coal, . . . . | 4,400 |

The collection of the taxes on both was sought from the defendants, who resisted the collection of taxes on the coal, claiming that said agreement operated as a sale or assignment of all the coal, and not merely of that mined.

The said agreement let unto John Jermyn all the coal beneath the surface of said tract of land, except certain reserved portions. The said lessee, at his own expense, and in a good and workmanlike manner, was to mine the coal and pay to the attorney in fact of the parties of the first part, twenty-five cents per ton for each ton of coal mined. The maximum quantity was unlimited, but the lessee was to mine and remove each and every year thereafter not less than sixty-five thousand tons, this being established as "the minimum quantity of coal to be mined yearly, and paid for whether mined or not." In case of fault in the veins, casualties to the mine, hindrances to transportation, or in the event of a strike that may prevent the operation of the mine, then the regular payments may be excused for a period not exceeding six months; but except for these causes, a failure to make payments for the minimum monthly quantity of coal required to be mined "shall, at the option of the parties of the first part, be taken as an abandonment by the party of the second part of all his rights under this lease to mine said coal."

The lease also contained the following clauses :

"And should the royalty herein agreed to be paid remain unpaid for thirty days, the said parties of the first part shall have the right to distrain any of the goods and chattels of the party of the second part, or his assigns found upon the said premises or adjoining premises in possession of said party of the second part, and should the same remain unpaid for a

period of sixty days after it is payable. and there is no property liable to distress sufficient to pay the royalty due, then the parties of the first part shall have the right to declare this lease wholly and absolutely forfeited, and may enter and repossess themselves of said coal hereby leased, either with or without legal proceedings."

"The said party of the second part also covenants and agrees to pay all government imposts, United States, state, county and local taxes upon the coal mined under this lease, without recourse or claim on the parties of the first part to refund any part of the same."

"And it is also understood and agreed by the parties hereto that the words, 'All coal beneath the surface,' expressed herein, wherever they occur, are intended to include only such veins of coal as are sufficiently remote from the surface to make the mining of them practicable and safe with regard to the preservation of the surface."

"The true meaning of this lease is to make it perpetual, until all the coal under the tract of land herein described is mined subject to the foregoing limitations and restrictions."

The agreement then provides that the final determination of the exhaustion of the coal to an amount less than sufficient to make the minimum shall be left to expert arbitrators to be appointed by the parties.

"The rights and privileges herein conferred shall extend to the heirs, executors, administrators and assigns of the respective parties hereto, and the covenants and obligations herein shall be binding on them as well.

If the court was of opinion, on the case stated, that the defendants were liable for the tax levied on the coal, then judgment was to be entered for the plaintiff in the sum of $50, but if not, then judgment to be entered for the defendant. The costs to follow the judgment, and either party reserving the right to sue out a writ of error.

The court entered judgment for the city of Scranton for $50, HAND, J., delivering the following opinion:

"After an examination of the lease in the case stated, and of the authorities in this State from Caldwell *v.* Fulton, 7 Casey, 475, down, we do not consider that the instrument in this instance is so drawn by apt words of conveyance as to constitute a full conveyance of the coal, and a vesting of the same in the lessee. A fair construction of the lease only passes title to so much coal as may be mined or paid for. It is true there is the right to mine all the coal, but the instrument does not convey it. It only becomes the property of Jermyn when either mined or paid for when not mined.

"Another clause in the lease provides that the lessee shall

pay taxes for coal mined. This, upon the principle *inclusio unius est exclusio alterius*, we think raises a very strong presumption that the lessee was not to be liable for the taxes on unmined coal."

The defendants thereupon took this writ, assigning for error the entry of judgment as aforesaid.

*George Sanderson, Jr.*, for plaintiffs in error.—A lease of all the coal under a certain tract of land, with unlimited time to mine it, though in words a lease, is really a grant of a complete freehold interest in the land, and should be assessed to the lessee, not to the owner of the surface: Scranton et. al. *v.* Phillips, 13 Norris, 15; Harlan *v.* The Lehigh Coal and Navigation Co., 11 Casey, 287; Palmer *v.* Edwards, 1 Douglas, 187, note by Buller, J.; Blackstone's Commentaries, vol. i., book 2, p. 317. The owner of the land and the owner of the coal are each taxable according to their respective interests; Logan *v.* Washington County, 5 Casey, 373.

I. *H. Burns*, city solicitor, for defendant in error.—A careful examination of the instrument shows that it did not convey the land itself at the time the instrument was executed, but only a right to detach and carry away a portion of it in compliance with certain specified conditions: Caldwell *v.* Fulton, 7 Casey, 475. If the principle *inclusio unius est exclusio alterius* does not apply to the construction of the clause mentioning the payment of taxes, then it is difficult to imagine a case where it would. In the case of Logan *v.* Washington County (5 Casey, 373), there was a sale and not a lease of the coal; all this court decided was that the owner of the coal was the proper party to pay the tax.

Mr. Justice CLARK delivered the opinion of the court, April 7, 1884.

The single question which arises upon the case stated, is whether the instrument of writing, bearing date the 10th day of May, 1875, between George Sanderson and the devisees of Charles Robb, deceased, of the one part, and John Jermyn, of the other part, is a lease, properly so called, or virtually a sale of the minerals in place. What is termed a mineral lease is frequently found to be an actual sale of a portion of the land; it differs from an ordinary lease in this, that although both convey an interest in land, the latter merely conveys the right to its temporary use and occupation, whilst the former conveys absolutely a portion of the land itself. It is one of the essential properties of a lease that its duration shall be for a determinate period, shorter than the duration of the estate of

the lessor, hence the estate demised is called a "term," and necessarily implies a reversion. If the entire interest of the lessor is conveyed, in the whole or a portion of his land, the conveyance cannot therefore be properly regarded as a demise, but as an assignment.

Upon examination of this instrument we find that the lease is not of the mine, with its approaches and appliances, and the right to use, occupy and operate the same, but it is a lease of "all the coal beneath the surface of the tract," with the right "to mine the coal and remove the same."

The maximum quantity to be mined and removed in each year is unlimited, but the minimum average quantity is fixed and certain, and that minimum quantity must be "paid for" in each year "whether mined or not." Provision is made for delays which may be caused from "faults" found, casualties, want of adequate transportation, strikes of employees, &c., but these hindrances are only to afford temporary excuse for non-payment; the rule of the contract is that 65,000 tons of coal shall be paid for in each year, "whether mined or not." The duration of the interest is not for any determinate period of time; it is not for years, for life, or at will; "the true meaning of the lease," as expressed therein, "is to make it perpetual until all the coal under the tract of land herein described is mined," that is to say, it is a lease of the coal until no coal remains. In what respect then, does this transaction lack the essential qualities of an actual sale? The language of this lease is in most respects similar to that referred to in the case of Scranton v. Phillips, 13 Norris, 15, which was "of all the coal in and under said lot and other lands for and during the term and period of time, as shall be required therefor, to mine and remove all said coal." The further stipulations bear a close analogy to the contract now before us. In delivering the opinion of the court in Scranton v. Phillips, the present chief justice says: "Although called a lease it was virtually a sale of all the coal, with unlimited time to remove it, with the right at their election to yield it up, after the expiration of ten years," &c. It is certainly true that a lease, properly so called, always conveys an interest in land, and in this respect it is to be distinguished from a mere license: 11 Casey, 287; but where that which purports to be a lease conveys the whole interest of the lessor, it differs in no respect from a sale: Palmer v. Edwards, 1 Doug., 187; note, 2 Black. Com., 317. When the purposes and objects of this instrument are perfected the coal will be exhausted and the lessor can have nothing by the reversion. It is true, in general, that Jermyn covenanted to pay monthly for the coal, as it was mined, at the rate of twenty-five cents per ton, but he also agreed to pay monthly

for a certain quantity whether it was mined or not, and the legal obligation to pay continued when all mining operations should cease. It cannot be said that Jermyn owned only the coal which he mined and paid for; it is true the payments were to be according to the yield of the mine, but the consideration of the contract depended upon the quantity of coal which the mine, upon measurement, might be found to contain, and that measurement was made as the mining progressed. The mere fact that the indenture contains a reservation of rent, with the right of distress, will not change its legal operation and effect.

We are of opinion, therefore, that there was such a severance of the surface from the underlying strata, as created a divided ownership in these distinct portions of the land. It is the duty of the assessors in the several counties to take an account in the form directed by law, of all houses, lands, &c., and to assess and value the same at the rate or price for which they would sell, at a bona fide sale, after full public notice. Land has an indefinite extent, upwards as well as downwards, but the law recognizes horizontal divisions of land. A severance of the surface from the underlying strata may be created, either by reservation or express grant; after severance a mineral right is an independent interest in land, it forms a distinct possession, is held upon a distinct title and is as much the subject of sale, devise or inheritance, and of separate taxation as the surface land: Caldwell *v.* Copeland, 1 Wright, 427.

A mineral right is taxable as land ; the owner of the surface and of the mine are each taxable, according to the value of their respective interests ; where there is a divided ownership there must be a divided taxation: Logan *v.* Washington Co., 5 Casey, 373.

The owner of surface land can no more be held for the tax upon the mineral strata, after a severance, than can the owner of the mine be held for the taxes upon the surface. The case is certainly not free from doubt; the paper purports to be a lease ; provides for a forfeiture upon violation of its conditions ; the price of the coal is denominated rent and the remedy for its collection is by distress. Yet the considerations we have stated have forced us to the conclusion that it was an actual sale, rather than a mere demise of the coal. The provision made for the payment by Jermyn, of all "government imposts, United States, state, county, and local taxes upon the coal mined under the lease, without recourse or claim on the parties of the first part, to refund any part of the same," is, we think, not important in the determination of this question. The mined coal is admittedly the property of Jermyn

[Megargel's Adm'r. v. Megargel.]

or his assigns, and why provision was made for the payment of the taxes upon it is as difficult to explain, upon one hypothesis as it is upon the other. It follows without stating it that the purchasers of the coal in place must pay the taxes upon it; to avoid uncertainty, however, as to the discharge of such burdens as then were, or thereafter might be, imposed upon the coal mined, this clause was doubtless inserted; in the event of a distress levied for the rent, this provision might become important in connection with the clause of forfeiture, contained in the contract. The interest of John Jermyn under the contract, before suit brought, was assigned to the Delaware, Lackawanna and Western Railroad Company, and the president, managers and company of the Delaware and Hudson Canal Company; subject to their title, the land and the agreement had been conveyed and assigned to the defendants below. The former, we think, are liable to taxation for the coal, the latter for the surface according to the valuation of each, respectively.

The judgment is therefore reversed, and judgment is now entered for the defendant below, on the case stated, with costs.